Catherine Kilduff (CA Bar No. 256331)
Kristen Monsell (CA Bar No. 304793)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7100
Facsimile: (510) 844-7150
ckilduff@biologicaldiversity.org
kmonsell@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity and Turtle Island Restoration Network*

**UNITED STATES DISTRICT COURT FOR THE**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization, and TURTLE ISLAND RESTORATION NETWORK, a non-profit organization,<br><br>Plaintiffs,<br><br>v.<br><br>HOWARD LUTNICK, Secretary of Commerce, and NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION,<br><br>Defendants. | Case No. 3:26-cv-08429<br><br>**COMPLAINT FOR DECLARATORY AND OTHER RELIEF** |

## INTRODUCTION

1. In this action against the Secretary of Commerce Howard Lutnick and the National Oceanic and Atmospheric Administration (collectively, NOAA), Plaintiffs Center for Biological Diversity and Turtle Island Restoration Network challenge the issuance of permits under the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), 16 U.S.C. §§ 1801–1884, to fish longlines in federal waters off California despite the high risk of catching and killing endangered and threatened wildlife.

2. Pacific leatherback sea turtles, for example, are particularly vulnerable to longline fishing gear. NOAA has identified these turtles as one of ten "Species in the Spotlight," which are among the most at-risk of extinction. The Pacific leatherback may be effectively extinct within 20 years if current trends continue. In waters off the central California coast, aerial surveys of leatherback sea turtles show a long-term decline of 5.6 percent annually from 1990 to 2017; the average estimate of 128 leatherbacks from 1990–2003 dropped to 55 in the period 2004–2017. At these low levels, every turtle counts for sustaining and potentially recovering the population.

3. Longlines float horizontally in the water for up to 60 miles in length with hundreds of hooks dangling in the water. Industrial longline fishing has pushed sea turtles toward extinction, while also decimating seabirds and marine mammals. Under the current fishery management plan for U.S. West Coast Fisheries for Highly Migratory Species, NOAA does not permit longlining within 200 nautical miles (nm) of the West Coast due to the risks to endangered species, including leatherback sea turtles. Yet this year it issued permits to two vessels, exempting them from this prohibition and allowing these vessels to fish with longline gear (hereafter, 2026 longline permits).

4. NOAA's issuance of these permits follows a December 2019 court decision holding that the agency unlawfully issued exempted fishing permits in response to the same two applications to fish with longline gear. The court vacated the permits, the biological opinion under the Endangered Species Act (ESA), and the environmental assessment under the National Environmental Policy Act (NEPA).

5. In issuing the 2026 longline permits, NOAA failed to comply with NEPA, 42 U.S.C. §§ 4321–4336f, the Coastal Zone Management Act (CZMA), 16 U.S.C. §§ 1451–1468, the Marine Mammal Protection Act (MMPA), 16 U.S.C. §§ 1361–1423h, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–596, 701–706. Specifically, NOAA failed to take a hard look at the environmental impacts that could result from the permits and failed to examine a reasonable range of alternatives, in violation of NEPA; violated the APA and CZMA by issuing the permits without responding to the California Coastal Commission's request for consistency review of the permits; and violated the APA and the MMPA by issuing the permits without authorization under the MMPA for the anticipated incidental catch of threatened Guadalupe fur seals. These violations mean NOAA's issuance of the permits also violates the Magnuson-Stevens Act, which requires the agency's actions to be consistent with federal laws.

6. Plaintiffs therefore request that the Court hold unlawful and set aside the 2026 longline permits, the accompanying environmental impact statement, and the record of decision.

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty); 28 U.S.C. §§ 2201–2202 (power to issue declaratory judgments and grant relief in cases of actual controversy); and 5 U.S.C. § 702 (Administrative Procedure Act).

8. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e), because (1) one or more Plaintiffs reside in this judicial district; (2) this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority; and (3) a substantial part of the events giving rise to the claims occurred here.

9. Pursuant to Civil Local Rule 3-2(c) and 3-2(d), the appropriate intradistrict assignment of this case is either to the San Francisco Division or the Oakland Division.

## PARTIES

### Plaintiffs

10. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (Center) is a national nonprofit conservation organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is dedicated to the preservation, protection, and restoration of biodiversity and ecosystems throughout the world. The Center has more than 101,000 members.

11. Plaintiff TURTLE ISLAND RESTORATION NETWORK (Turtle Island) is a nonprofit 501(c)(3) corporation with its principal place of business in Olema, California, that works through scientific research, legal and policy advocacy, education, and restoration efforts to protect marine and riparian wildlife globally. Turtle Island's organizational mission is dedicated to the preservation, protection, and restoration of marine biodiversity, native species, and ecosystems. Turtle Island's approximately 160,000 supporters and members throughout the United States and the world share a commitment to the study, protection, enhancement, conservation, and preservation of the world's marine and terrestrial ecosystems, including protection of sea turtles and marine mammals.

12. Plaintiffs bring this action on behalf of their members who derive ecological, recreational, aesthetic, educational, scientific, professional, and other benefits from the California coastline and adjacent waters of the Pacific Ocean where the longline fishing, sea turtles, whales, and Guadalupe fur seals are located.

13. Plaintiffs' members live near and regularly visit the areas off the California coast where leatherback and loggerhead sea turtles, humpback whales, and Guadalupe fur seals often aggregate to feed in rich, productive waters. Plaintiffs' members enjoy studying, photographing, observing, and attempt to observe these animals. Plaintiffs' members regularly visit areas in and around the southern California coast, Monterey Bay, San Francisco Bay, Point Reyes, and Humboldt Bay, among others. Plaintiffs' members have experienced the joy of observing sea turtles, humpback whales, and Guadalupe fur seals within the Santa Barbara Channel, San Francisco Bay, and North Coast regions and have also experienced the heartbreak of observing

live whales with entanglement scars and dead whales on adjacent coastlines. Many of Plaintiffs' members live in the coastal areas of Los Angeles and San Francisco Bay, and many of Plaintiffs' members have specific intentions to continue to use and enjoy these areas and adjacent waters of the Pacific Ocean frequently and on an ongoing basis in the future.

14. An integral aspect of the Plaintiffs' members' use and enjoyment of leatherback and loggerhead sea turtles, humpback whales, and Guadalupe fur seals is the expectation and knowledge that the species are in their native habitat. For this reason, the Plaintiffs' members' use and enjoyment of these animals is entirely dependent on the continued existence of healthy, sustainable populations in the habitat off the California coast. NOAA's failure to comply with applicable environmental laws deprives leatherback and loggerhead sea turtles, as well as humpback whales and fur seals, of statutory protections that are vitally important to the species' survival and eventual recovery.

15. One Center member took her young daughter whale watching in Monterey Bay in September 2021 and saw many humpbacks. She enjoyed her trip but felt sad to see multiple humpbacks with scars from interactions with fishing gear. She regularly looks for whales from shore at the Point Reyes National Seashore and has seen migrating grey whales from the Point Reyes lighthouse. In November 2024, she and her two young children sailed a mile seaward of the Golden Gate Bridge to look for whales but did not see any. She visited Baja California four times in the past five years to observe migrating humpback whales, and she appreciates knowing the same whales she saw in Mexico migrate past the San Francisco Bay area where she lives. In summer 2025, she heard news reports of many dead whales on Bay Area beaches and observed one dead whale near Point Isabel in Richmond. She is now anxious when she sees migrating whales, knowing the threats off the California coast, lessening her enjoyment of seeing these animals. She intends to continue to regularly look for whales from the California coast and on whale watching trips.

16. Another Center member routinely goes whale watching off California and in 2021 spent four days in Monterey Bay observing whales, including humpback whales. He has experience as a field biologist and spent time on the Farallon Islands studying leatherback sea

turtles, seabirds, elephant seals, great white sharks, and other wildlife. He has seen leatherback sea turtles along the coast of California, including on boat trips to the Farallon Islands and near Monterey. He has seen leatherback, hawksbill, loggerhead, green, and olive ridley sea turtles in many different parts of the world and has visited Indonesia more than once to go snorkeling, diving, and looking for sea turtles, including Pacific leatherback sea turtles. He plans on joining a pelagic wildlife watching trip this month to look for Guadalupe fur seals and other wildlife.

17. These and other Center members intend to continue to use and enjoy the habitat of humpback whales, Guadalupe fur seals, and sea turtles frequently and on an ongoing basis in the future. Actions that injure or kill these animals, such as permitting vessels to use longline gear off California's coast, make it less likely that these members will see them in future.

18. Plaintiffs have a long history of advocating for endangered sea turtle and marine mammal protections to prevent longline fishing gear entanglements in the waters off California. For example, Plaintiffs and other groups petitioned for leatherback sea turtle critical habitat in the Pacific, leading to the designation of 40,000 square miles off California, Oregon and Washington in 2012. Plaintiffs and allies also filed a lawsuit to get humpback whale critical habitat, leading to the designation of 302,961 square miles for three populations in the Pacific in 2021. The 2026 longline permits authorize fishing in portions of designated leatherback sea turtle and humpback whale critical habitat.

19. In 2019, on behalf of their members, Plaintiffs brought claims under NEPA and the ESA to challenge the longline exempted fishing permits issued in 2019. That litigation resulted in a court order vacating the permits, the biological opinion and the environmental assessment. *Ctr. for Biological Diversity v. Ross*, No. 4:19-cv-03135-KAW, 2019 WL 7020195 (N.D. Cal. Dec. 20, 2019). The court held that (1) the biological opinion failed to consider the best available science on the population and status of leatherback sea turtles; (2) the environmental assessment was arbitrary and capricious in finding the death of one leatherback sea turtle was insignificant and did not warrant preparing an environmental impact statement despite NOAA's contrary findings elsewhere; and (3) these violations of law meant NOAA's issuance of the permits also violated the Magnuson-Stevens Act. *Id.* at *16, 20.

20. The interests of Plaintiffs' members have been, are being, and will continue to be adversely harmed by NOAA's failure to fulfill its legal duties under NEPA, CZMA, the MMPA, and the APA. Through NOAA's issuance of the 2026 longline permits, endangered and threatened sea turtles and marine mammals will likely be caught in longlines in their valuable foraging habitat off California, which in turn significantly and directly harms Plaintiffs' members. These are actual, concrete injuries presently suffered by Plaintiffs' members, and they will continue to occur unless this Court grants relief. The relief sought herein—including an order vacating the 2026 longline permits—would redress those harms. Plaintiffs and their members have no other adequate remedy at law.

**Defendants**

21. Defendant HOWARD LUTNICK, U.S. Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that capacity, has responsibility for its administration and implementation of the Magnuson-Stevens Act, NEPA, CZMA, the MMPA, and for compliance with all other federal laws applicable to the Department of Commerce. He is sued in his official capacity.

22. Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION is an agency within the Department of Commerce. NOAA Fisheries (also called the National Marine Fisheries Service) is an agency within NOAA to which the Secretary of Commerce has delegated his authority to implement the Magnuson-Stevens Act and therefore has responsibility for implementing and fulfilling its duties to comply with NEPA, CZMA, and the MMPA.

**LEGAL BACKGROUND**

**National Environmental Policy Act**

23. Congress enacted NEPA to ensure that federal, state, and local governments, as well as public and private organizations, "use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony." 42 USC § 4331(a).

24. NEPA mandates that federal agencies prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42

U.S.C. § 4332(2)(C). "The term 'major Federal action' means an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

25. NEPA requires that agencies take a "hard look" at the impacts of their actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). The environmental review must include a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C)(iii), (F). It must disclose the relationship between short-term uses and the maintenance and enhancement of long-term productivity of the human environment. *Id.* § 4332(2)(C)(iv). In undertaking its NEPA analysis, a federal agency must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document" and "make use of reliable data and resources." *Id.* § 4332(2)(D), (E).

26. The agency must closely examine the EIS "objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F3d 1135, 1142 (9th Cir. 2000).

**Coastal Zone Management Act**

27. CZMA was enacted in 1972 to provide comprehensive, coordinated planning for the protection of the "coastal zone," meaning shorelines and adjacent areas of coastal states, as well as coastal waters extending seaward to the limits of the United States territorial sea. As Congress recognized at that time, "[t]he increasing and competing demands upon the lands and waters of our coastal zone . . . including [the] harvesting of fish, shellfish, and other living marine resources, have resulted in the loss of living marine resources, wildlife, nutrient-rich areas, permanent and adverse changes to ecological systems, decreasing open space for public use, and shoreline erosion." 16 U.S.C. § 1451(c).

28. Accordingly, the primary purposes of CZMA are "to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations," and "to encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management

programs to achieve wise use of the land and water resources of the coastal zone." *Id*. § 1452(1), (2).

29. CZMA provides states that have an adopted coastal management plan with oversight over federal activities affecting a coastal zone, a process known as "consistency review." *See* 16 U.S.C. § 1456(c); 15 C.F.R. pt. 930. In particular, any federal agency activity "within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." 16 U.S.C. § 1456(c)(1)(A). State agencies develop a list of the types of federal licenses or permit activities they wish to review for consistency with the management program. 15 C.F.R. § 930.53. For unlisted activities for which a state requests consistency review on a case-by-case basis, "the Federal agency shall not issue the license or permit until the requirements of this subpart have been satisfied, unless [the federal agency] disapproves the State agency's request to review the activity." 15 C.F.R. § 930.54(b). Federal agencies must provide consistency determinations to applicable state agencies, and to facilitate state review, they should coordinate with those state agencies before making a determination. *Id*. § 930.34(a)(1). Federal agencies also must notify and provide negative determinations to state agencies if they find that there will not be coastal effects. *Id*. 930.35.

30. The California Coastal Commission is a public agency of the State of California created by the California Coastal Act of 1976. Cal. Pub. Res. Code §§ 30300–30305. The Commission is designated as the state coastal zone planning and management agency for CZMA purposes and may exercise any and all powers set forth in that statute. *Id*. § 30330. The Commission is authorized to request to review consistency determinations under CZMA regarding whether a federal activity conforms with the provisions of the California Coastal Act, which is California's federally approved coastal zone management program.

31. The consistency review process triggers public notice, comment, and a public hearing at the state level. *See, e.g*., 15 C.F.R. §§ 930.41(a), 930.42; *see also id*. § 930.2 ("State management programs shall provide an opportunity for public participation in the State agency's

review of a Federal agency's consistency determination or an applicant's or person's consistency certification."); Cal. Pub. Res. Code § 30006 ("[T]he public has a right to fully participate in decisions affecting coastal planning, conservation, and development."); Cal. Code Regs., tit. 14, § 13660.4(b) (requiring the California Coastal Commission to hold public hearings on consistency certifications).

**Marine Mammal Protection Act**

32. Congress enacted the MMPA in 1972 in response to widespread concern that large numbers of marine mammals were being killed through interactions with commercial fisheries. Congress found that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). The policy behind the MMPA is that "such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population." *Id.* § 1361(2).

33. The primary mechanism by which the MMPA protects marine mammals is through the implementation of a moratorium on the take of marine mammals. *Id.* § 1371(a). The MMPA prohibits "any person subject to the jurisdiction of the United States or any vessel or other conveyance subject to the jurisdiction of the United States to take any marine mammal on the high seas." *Id*. § 1372(a)(1). It also makes it unlawful for "any person or vessel or other conveyance to take any marine mammal in waters or on lands under the jurisdiction of the United States," and "any person to use any port, harbor, or other place under the jurisdiction of the United States to take . . . marine mammals." *Id*. § 1372(a)(2).

34. "Take" is defined broadly by the MMPA to mean "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13). Harassment is also broadly defined to mean:

> Any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild; or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration,

> breathing, nursing, breeding, feeding, or sheltering.

*Id*. § 1362(18)(A).

35. In addition, the MMPA requires NOAA to prepare a "stock assessment" for each marine mammal population in U.S. waters, documenting the population's abundance and trend, describing the fisheries that interact with the populations, and estimating the level of "mortality and serious injury" caused by those fisheries each year. *Id*. § 1386(a). NOAA defines "serious injury" as "any injury that will likely result in mortality." 50 C.F.R. § 229.2. The MMPA requires NOAA to review stock assessments at least annually for populations that are specified as strategic stocks—like the humpback whale and Guadalupe fur seal—and revise the assessment if the status of the stock has changed or can be more accurately determined. *Id*. § 1386(c).

36. The MMPA contains limited exceptions to its broad prohibition on take. Section 101(a)(5)(E) allows NOAA to permit commercial fisheries to cause incidental take of marine mammals listed as threatened or endangered under the ESA if NOAA determines, "after notice and opportunity for public comment," that:

> (I) the incidental mortality and serious injury from commercial fisheries will have a negligible impact on such species or stock;
>
> (II) a recovery plan has been developed or is being developed for such species or stock pursuant to the [ESA]; and
>
> (III) where required under [16 U.S.C. § 1387], a monitoring program is established . . . and a take reduction plan has been developed or is being developed for such species or stock.

16 U.S.C. § 1371(a)(5)(E).

37. When establishing the take exemption for commercial fisheries, the legislative committee noted that "the 'negligible impact' standard in the MMPA is more stringent than the 'no jeopardy' standard in the ESA, and consequently provides more protection for endangered or threatened marine mammals under the MMPA than under the ESA." H.R. Rep. No. 103-439 (1994).

38. For fisheries for which NOAA makes a "negligible impact determination" under clause (I) above, NOAA "shall" use emergency authority to prescribe regulations to protect endangered or threatened marine mammals "[i]f, during the course of the commercial fishing

season, [NOAA] determines that the level of incidental mortality or serious injury . . . has resulted or is likely to result in an impact that is more than negligible on the endangered or threatened species or stock." 16 U.S.C. §1371(a)(5)(E)(iii).

**Magnuson-Stevens Fishery Conservation and Management Act**

39. The Magnuson-Stevens Act governs fishing by U.S. vessels. 16 U.S.C. § 1801.

40. NOAA may authorize—for limited testing, exploratory fishing, or other reasons—fishing that would otherwise be prohibited. 50 C.F.R. § 600.745(b). These permits, known as "exempted fishing permits," exempt vessels from only those regulations specified in the permits; all other applicable regulations remain in effect. *Id*.

41. Exempted fishing permits must be consistent with federal law. *Id.* § 600.745(b)(3)(iii)(D), (b)(3)(v)(H).

**Administrative Procedure Act**

42. The Administrative Procedure Act (APA), 5 U.S.C. §§ 551–596, 701–706, provides for judicial review of final agency actions. Under the APA, a person may seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed . . . ." *Id*. § 706(1).

43. The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

**FACTUAL AND PROCEDURAL BACKGROUND**

44. NOAA prohibited fishing for swordfish and tuna with longlines along the U.S. West Coast out to 200 miles to protect loggerhead sea turtles in 2004. 50 C.F.R. § 660.712. California law also prohibits longline fishing to protect marine wildlife from being incidentally caught on hooks and entangled in lines. Cal. Fish & Game Code § 9028.

45. Endangered leatherback sea turtles, endangered loggerhead sea turtles, endangered and threatened humpback whales, and threatened Guadalupe fur seals are all at risk of incidental catch under the 2026 longline permit. These animals can be hooked or entangled in lines; sea turtles have been found entangled in branch lines, main lines, and float lines.

Entanglement can result in substantial wounds, including cuts, constriction, or bleeding on any body part. Sea turtles are most often entangled in longline gear around their necks and flippers.

46. Longline fishing distributes numerous hooks over a large ocean area to catch swordfish or tuna. A monofilament mainline up to 60 nautical miles long is set horizontally at a preferred depth in the water column and suspended by floats. Branch lines are clipped to the mainline at regular intervals, and each branch line carries a single baited hook. On average, only about one percent of those hooks catch a marketable swordfish or tuna.




Figure 1. General configuration for longlines.
Credit: Food and Agriculture Organization of the United Nations

47. When set at less than about 330 feet deep, the longlines are “shallow-set” to target swordfish, but also incidentally catch marlin, albatross, Guadalupe fur seals, and sea turtles. When set deeper, usually at 900 to 1300 feet, the longlines are “deep-set” to target tuna. While deep-set longlines incidentally catch fewer sea turtles on a per-hook basis as compared to shallow-set longlines, U.S. fishermen set far more deep-set hooks in the Pacific Ocean and those are deadlier because of the higher probability of turtles drowning. About twenty percent of

leatherback sea turtles caught in the Hawaii deep-set longline fishery are dead when brought to the vessels. In the Hawaii shallow-set longline fishery, about twenty percent of the leatherback sea turtles released alive die from their injuries, and others released alive likely suffer effects ranging from high stress following release to significant injuries that impact their feeding, migration, or breeding.

48. Since the prohibition of longline gear off the U.S. West Coast went into effect, NOAA requested public comment three times on an application for an exempted fishing permit for vessels to use longline gear. The California Coastal Commission asked to review the permit under CZMA each time. In 2007, NOAA approved California's request to review the permit; the permit applicant withdrew the application before the California Coastal Commission completed its review. In 2008, the same applicant applied to use longlines 50 to 200 nautical miles offshore; that time NOAA denied California's requested review but again the applicant withdrew its permit request.

49. In 2015 NOAA requested public comment on applications for fishing permits to use deep-set and shallow-set longline gear in the exclusive economic zone (within 200 nautical miles from shore) off the U.S. West Coast for two years. 80 Fed. Reg. 29,662 (May 22, 2015).

50. On June 19, 2015, the California Coastal Commission formally notified NOAA that it intended to review the proposed permit under CZMA and requested permission to proceed with federal consistency review.

51. NOAA waited to issue a decision until it established mitigation and monitoring requirements, the exact location of the fishing, number of sets, gear configuration, and authorized take levels for leatherback sea turtles and other protected species. In part based on these permit specifications, including the prohibition of fishing in the Southern California Bight, NOAA denied the California Coastal Commission's request for consistency review on March 28, 2019. It subsequently issued the Exempted Fishing Permit for two vessels to use deep-set and shallow-set longlines between 50 and 200 miles off California for two years. 84 Fed. Reg. 20,108 (May 8, 2019).

52. In December 2019, a court vacated those permits, the biological opinion that established terms and conditions for the permits, and the environmental assessment prepared under NEPA. *Ctr. for Biological Diversity v. Ross*, No. 4:19-cv-03135-KAW, 2019 WL 7020195 (N.D. Cal. Dec. 20, 2019).

53. In March 2025, NOAA completed a Final Environmental Impact Statement (EIS) for Consideration of Exempted Fishing Permits for Testing Fishing Practices to Target Swordfish and Other Marketable Highly Migratory Species in the United States West Coast Exclusive Economic Zone. The Record of Decision was signed on June 2, 2025.

54. On July 17, 2026, NOAA updated its website to indicate that it had issued exempted fishing permits for two vessels to use "West Coast Modified Longline" gear. According to the sample permits, these vessels may fish deep-set or shallow-set longlines on the same trip but must declare which before the set. Shallow-set longline EFP fishing sets are limited to 700 hooks or fewer, and deep-set longline EFP fishing sets are limited to 1,600 hooks or fewer. All fishing is required to be monitored by on-board observers.

**Leatherback Sea Turtles**

55. Leatherback sea turtles were listed as endangered in 1970 under the Endangered Species Conservation Act—the precursor to the Endangered Species Act—and as endangered under the Endangered Species Act upon its enactment in 1973. 35 Fed. Reg. 8491 (June 2, 1970).

56. In 2021, Pacific leatherback sea turtles were listed under the California Endangered Species Act. Cal. Code Regs. tit. 14, § 670.5(a)(4)(D). The leatherback sea turtle is California's official marine reptile. Cal. Gov't Code § 422.5(b). California designated October 15 as Pacific Leatherback Sea Turtle Conservation Day, and it "urges state and federal agencies to take proactive conservation measures and prevent further threats to Pacific leatherback sea turtles and their habitats." *Id*. § 7593.5.



Pacific leatherback sea turtle. Credit: NOAA Fisheries

57. NOAA completed a comprehensive status review of leatherback sea turtles in 2020. 85 Fed. Reg. 48,332 (Aug. 10, 2020). NOAA did not propose changes to the existing global listing of leatherback sea turtles as endangered. *Id.* at 48,332. It found, however, that seven populations would meet the discreteness and significance criteria for recognition as distinct population segments under the Endangered Species Act. *Id.* at 48,337.

58. One of those populations, the West Pacific leatherback sea turtle, generally migrates from nesting beaches in Indonesia, Papua New Guinea, and the Solomon Islands to forage in the eastern Pacific Ocean, including in waters off the West Coast. Juvenile West Pacific leatherback sea turtles swim thousands of miles searching for abundant food, such as exists in the central California ecoregion. West Pacific leatherback sea turtles that migrate to central California may require multiple years of seasonal foraging before returning to nest, while those feeding in closer year-round prey resources might remigrate to nesting beaches annually. Thus, West Pacific leatherbacks feeding off central California may have lower productivity and reproductive output.

59. The low number of female West Pacific leatherbacks (currently 790 females) "places it at risk for environmental variation, genetic complications, demographic stochasticity,

negative ecological feedback, and catastrophes." 85 Fed. Reg. at 48,389. The small number of nesting females is a major factor in its extinction risk. *Id*. Scientists predicted in 2013 that there would be about 260 adult females in 2040, i.e. a population so low that leatherbacks could not make a comeback. A recent model predicted that the West Pacific leatherback adult abundance will decline by 71 percent in the next 20 years, dropping to only 418 adults (including both males and females).

60. West Pacific leatherbacks have a declining nesting trend. The decline in nest counts at one of the largest nesting sites was 5.7 percent annually from 2001 to 2017. Consistent with this declining trend, leatherback abundance off central California declined 5.6 percent annually over 28 years, which corresponds to an overall decline of 80 percent. From 1990 to 2003, the average estimate of leatherbacks foraging off central California was 128. From 2004 to 2017, the average number dropped to 55. Leatherbacks foraging off central California are adult or sub-adult and about 73 percent are female.

61. A proportion of the West Pacific leatherback population nests during summer, and the remainder nest during winter, which increases the population's resilience to unfavorable environmental conditions. Approximately 38 to 57 percent of summer-nesting females from an Indonesian nesting beach migrate to West Coast foraging grounds, including Central California waters.

62. In 2012, NOAA designated approximately 16,910 square miles off the California coast as leatherback "critical habitat," i.e. essential to the conservation of the species. 77 Fed. Reg. 4170 (Jan. 26, 2012). Factors that NOAA considered in designating critical habitat included leatherback presence as determined by satellite-linked transmitters attached to leatherbacks in California and oceanographic features like a coastal thermal front located within 60 miles of shore that aggregates prey like jellyfish. Each leatherback sea turtle equipped with a satellite transmitter contributed data to a model that determined how areas off the West Coast were used—whether for foraging or transit, for example.

63. The survival and recovery of the leatherback sea turtle is threatened by coastal and open-ocean fisheries internationally and in the United States. Other threats to the species include vessel strikes and pollution, among others.

64. Loss of West Pacific leatherback sea turtles would result in a significant gap in the range of leatherback sea turtles as a species. The potential for its imminent extinction warrants extreme caution in assessing impacts of fisheries entanglements.

**Loggerhead Sea Turtles**

65. Endangered North Pacific Ocean loggerheads spend the majority of their lives in the ocean, migrating over 7,500 miles from nesting sites in Japan and the South China Sea to at least two primary feeding grounds, one off the coast of Mexico and Southern California and one in the central North Pacific, north of Hawaii. NOAA reclassified the North Pacific population of loggerhead sea turtles from threatened to endangered in 2011. 76 Fed. Reg. 58,868 (Sept. 22, 2011). NOAA concluded that incidental capture in commercial fishing gear is a significant threat to the survival of the species. *Id.* at 58,907.

66. Loggerhead sea turtles' presence off the West Coast varies spatially according to sea surface temperature and whether an El Niño is occurring. When anomalous warming of the North Pacific and El Niño conditions occurred in 2015, scientists conducting aerial surveys estimated 70,000 loggerheads foraged off Southern California, but during a non-El Niño year, 2011, there were zero observed loggerheads.

67. NOAA expects the presence of loggerhead sea turtles in the Southern California Bight to increase as warmer sea surface temperatures occur.

68. Analysis of nearly three decades of loggerhead sea turtle satellite tracking data showed that the average latitude of foraging habitat in the North Pacific Transition Zone has shifted northwards by 450–600 kilometers. The northern boundary of the turtles' range has shifted concurrently with the southern boundary, indicating that this was not a range expansion.

69. The shifting habitat increases the risk to loggerhead sea turtles of catch in fishing gear as the sea turtles move out of protected areas that used to be productive habitat.

70. The California drift gillnet fishery, which targets the same fish as the longlines,

recently entangled at least two loggerhead sea turtles: one in 2023 and one in the 2025–2026 fishing season. These entanglements are consistent with science showing a northward shift that increases fishery overlap with loggerhead sea turtles.

**Humpback Whales**

71. In 2016, NOAA revised the listing for the global population of humpback whales to identify 14 distinct population segments, two of which can be found off California. 81 Fed. Reg. 62,260 (Sept. 8, 2016). NOAA listed the Central America humpback population as endangered and listed the Mexico humpback population as threatened. *Id*. at 62,305–08. NOAA subsequently designated critical habitat, including in waters off California. 86 Fed. Reg. 21,082 (Apr. 21, 2021). Entanglement in commercial fishing gear is one of the primary threats to the recovery of these ESA-listed populations.

72. NOAA identified "prey" as the essential feature of humpback whale critical habitat and determined that "the whales' ability to move freely to access their prey while on the feeding grounds" is inherent in that essential feature. *Id*. at 21,116–17. Thus, a federal action that "has the potential to obstruct the whales' movement and thereby prevent or impede the whales' ability to access prey" is a negative impact on critical habitat. *Id*. at 21,116.

73. Humpback whales regularly travel through and around fishing gear, and the species' tendency to inhabit coastal waters make it the most commonly entangled whale species in U.S. waters. Most entangled whale reports on the U.S. West Coast are in California.

74. Currently the West Coast is experiencing a marine heatwave and El Niño conditions with potentially drastic impacts to endangered species. Humpback whales are affected because of "habitat compression," which means that their prey is compressed into a smaller area than usual—potentially creating more overlap with fisheries and thus more entanglement risks.

**Guadalupe Fur Seals**

75. The Guadalupe fur seal is listed as "threatened" under the California Endangered Species Act. Cal. Code Regs. tit. 14, § 670.5(b)(6)(H). The Guadalupe fur seal is a California "fully protected mammal," which means that it may not be taken or possessed at any time, except for necessary scientific research. Cal. Fish & Game Code § 4700.

76. From 2018 to 2023, threatened Guadalupe fur seals were the marine mammal with the highest number of reported takes by the Hawaii shallow-set fishery (nine). Once entangled, Guadalupe fur seals may drag and swim with fishing gear attached for long distances, ultimately resulting in fatigue, compromised feeding ability, or severe injury, which may lead to reduced reproductive success and death.

77. Threatened Guadalupe fur seals suffered an "unusual mortality event" from January 1, 2015, through September 2, 2021, when strandings on the California coast were eight times higher than the historical average. In total, 715 Guadalupe fur seals stranded in California, Oregon, and Washington during the unusual mortality event, the majority of which were malnourished and emaciated weaned pups and yearlings (less than 2 years old). During the unusual mortality event off the coast of California, 2 of 98 stranded animals (2%) were found entangled in fishing gear in 2015, and 9 of 26 animals (35%) were found entangled in 2016. Most strandings were attributed to unusually warm water from the "Warm Water Blob," El Niño, and several ocean heatwaves in the Pacific Ocean during these years.

78. Like humpback whales, Guadalupe fur seals are drastically affected by marine heatwaves and El Niño conditions, particularly since those reduce the availability of their favored prey. During the 2014–2016 marine heatwave, over half the mortalities (54 percent) during 2015 were due to emaciation compared to less than ten percent in 2013. Guadalupe fur seals have decreased body mass and neonate survival during intense marine heatwaves. Unlike humpback whales that may swim hundreds of miles to feed, Guadalupe fur seals are geographically constrained to waters surrounding certain islands off Mexico and California, making them especially vulnerable to periodic and cyclic warming of the northeast Pacific Ocean. Nonetheless, during the 2014–2016 marine heatwave, Guadalupe fur seals foraged more northerly and offshore.

79. The current marine heatwaves and intense El Niño conditions may increase the overlap with the vessels fishing under the 2026 longline permits.

**The 2026 Longline Permits' Environmental Consequences**

80. To predict the environmental consequences of the 2026 longline permits in the

EIS, NOAA analyzed a subset of data from the Hawaii deep-set and shallow-set longline fishery that included only data from fishing trips east of 140° west longitude.

81. The Hawaii deep-set longline fishery caught an estimated 136 leatherback sea turtles in the most recent five years (2020–2024), or an average of 27.2 annually. On average, about 20 percent of leatherback sea turtles captured in the deep-set longline fishery were dead when they were brought to the vessel. When immediate and post-release mortality are combined, the mortality rate for leatherback turtles captured in this fishery is 36 percent. That means that the Hawaii deep-set longline fishery kills almost ten leatherback sea turtles each year.




Figure 2: Location of Hawaii deep-set longline fishery as illustrated by effort (observed) from 2004 to 2020. Colors from blue to red illustrate areas of lower to higher number of sets. Black rectangle is where more than 50 percent of effort occurred in 2023 and 2024. Credit: NOAA

82. Despite this, the proxy dataset for the Hawaii deep-set longline fishery that NOAA analyzed in the EIS—limited to fishing occurring east of 140° west longitude (see figure below)—included no catches of leatherback sea turtles. For that reason, the EIS projected no

leatherback sea turtle would be caught by vessels fishing deep-set longlines under the 2026 longline permits.

83. Based in part on the EIS projections of no catch of leatherback sea turtles in the deep-set longline gear, the EIS concluded that the effects of the 2026 longline permits on the leatherback sea turtle population are likely to be minor.

84. For humpback whales, the Hawaii shallow-set longline fishery caught a humpback whale in 2011, which led NOAA to increase its anticipated take in Hawaii shallow-set longlines to two humpback whales annually. One humpback whale was observed caught in the shallow-set longline fishery in 2015. One humpback whale was observed caught and likely to die from its injuries in the deep-set longline fishery in 2014. Despite these documented captures in the Hawaii longline fisheries, the proxy dataset that NOAA analyzed did not include any take of humpback whales. Thus the EIS did not provide a quantitative projection of humpback whale captures.

85. Further, after the draft EIS was published, NOAA analyzed more recent observer data for the proxy datasets, including updated U.S. West Coast drift gillnet observer data (2020/2021 through 2022/2023). NOAA said it "showed no significant change from those presented in the draft EIS; therefore, NMFS made no changes to the Proposed Action or its conclusions as a result of this new information." Yet there were two confirmed humpback whale entanglements in the West Coast drift gillnet fishery: one in the 2020/2021 fishing season (released alive with no gear attached) and one in the 2021/2022 fishing season (released alive with gear attached). These confirmed humpback whale entanglements are an underestimate of actual entanglements because the fishery is not 100 percent observed. But the fact of the entanglements shows the risk to humpback whales from fishing gear targeting swordfish and tuna off California. The EIS still concluded the impacts of the 2026 longline permits would be minor.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of NEPA and APA
### (Failure to take legally required hard look)

86. Paragraphs 1 through 85 are hereby realleged as though set out in full.

87. NEPA mandates that federal agencies prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §§ 4332(2)(C), 4336e(10). NOAA's issuance of the 2026 longline permits constitutes a major federal action within the meaning of NEPA and a final agency action within the meaning of the APA.

88. NOAA has failed to take the "hard look" at the environmental impacts of its actions that NEPA requires.

89. To analyze the impacts of the 2026 longline permits from bycatch, NMFS used data from the Hawaii longline fisheries. However, NOAA selected proxy datasets from the Hawaii longline fisheries limited to information east of 140° west longitude instead of using complete datasets. NOAA's failure to disclose all entanglements from the Hawaii longline fisheries minimized the extent of incidental catch of humpback whales and leatherback sea turtles and minimized the mortality rate for leatherback sea turtles. In turn, the EIS minimized the extent of incidental catch of humpback whales and leatherback sea turtles under the 2026 longline permits.

90. For example, Hawaii longlines caught humpback whales in 2011, 2014, and 2015, but these were not disclosed or analyzed in the EIS. In 2024, Hawaii deep-set longlines caught an estimated 54 leatherback sea turtles, but these were not disclosed or analyzed in the EIS. Twenty percent of leatherback turtles caught in the Hawaii deep-set longline fishery are dead when they arrive at the ship, and the effective mortality rate—including post-release mortality for those not immediately killed—is 36 percent, but this was not disclosed or analyzed in the EIS. As a result of the lack of disclosures, NOAA arbitrarily projected no leatherback sea turtle catches in the deep-set longline gear authorized by the 2026 longline permits. It also arbitrarily projected that

humpback whale catches are unlikely, despite fishing potentially occurring in a portion of humpback whale critical habitat.

91. Additionally, the California drift gillnet fishery caught humpback whales in both the 2020/2021 fishing season and the 2021/22 fishing season. In recent years, there have also been three entanglements reported that potentially were associated with large mesh drift gillnet gear, though NOAA could not determine the origins of the fishing gear. NOAA arbitrarily, and without a reasoned explanation, concluded that despite these recent entanglements, impacts to humpback whales from the 2026 longline permits would be minor.

92. NOAA must disclose the relationship between short-term uses and the maintenance and enhancement of long-term productivity of the human environment. 42 U.S.C. § 4332(2)(C)(iv). The West Pacific leatherback adult abundance is expected to decline by 71 percent in the next 20 years, to only 418 adults. A subset of those sea turtles feed off the California coast. A 28-year aerial survey study foraging habitats off central California estimated the presence of 128 leatherback sea turtles from 1990 to 2003 but only 55 leatherback sea turtles for the years 2004 to 2017, indicative of a 5.6 percent annual decline. This is slightly less than the 6.1 percent decline for the total population, which includes sea turtles that do not migrate to feeding habitat off California. Nowhere does the EIS disclose the risk that the 2026 longline permits—by occurring solely in California—contribute disproportionately to the localized extirpation of leatherback sea turtles that feed off California's coast. NOAA's failure to disclose the relationship between the catch of leatherback sea turtles resulting from issuing the 2026 longline permits and the long-term projections for the presence of leatherback sea turtles off California is arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA. 5 U.S.C. § 706(2).

93. In issuing its EIS and the record of decision, NOAA acted arbitrarily, capriciously, contrary to law, abused its discretion, and failed to follow the procedure required by NEPA. 5 U.S.C. § 706(2)(A), (D).

**SECOND CLAIM FOR RELIEF**

**Violations of CZMA and APA**
**(Failure to Respond to Request for Consistency Review)**

94. Paragraphs 1 through 85 are hereby realleged as though set out in full.

95. NOAA's issuance of exempted fishing permits for California longline fishing is a final agency action within the meaning of the APA. In issuing the permits, NOAA has violated and continues to violate CZMA and the APA. 16 U.S.C. § 1456; 5 U.S.C. § 706(2).

96. On June 19, 2015, the California Coastal Commission formally notified NOAA of its intention to review the proposed longline fishing activity offshore California. *See* 15 C.F.R. § 930.54. This notice was timely made within the required 30-day period and in compliance with regulations. *Id.* § 930.54(a)(1).

97. On the basis of information and belief, NOAA failed to respond to this request as it pertains to issuing the California longline fishing permits in 2026. NOAA has a legal obligation to respond to the California Coastal Commission's request and failed to comply with this discrete, mandatory duty for these permits. 16 U.S.C. § 1456; 15 C.F.R. § 930.54(b). Issuing the California longline fishing permits without first responding to California's request is an action unlawfully withheld and violates the APA. 5 U.S.C. § 706(1).

98. In the alternative, and to the extent that NOAA relied on a response sent to the California Coastal Commission on March 28, 2019, this reliance is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A), (D).

99. For example, the 2019 permits' requirements included a prohibition on fishing within the Southern California Bight, which was to protect loggerhead sea turtles. In 2019, NOAA relied on the prohibition on fishing in the Southern California Bight to conclude the fishing would not result in reasonably foreseeable effects on any coastal use or resource of California because loggerhead sea turtles there would not be at risk. Fishing is no longer prohibited in the Southern California Bight under the 2026 California longline fishing permits.

100. Further, NOAA's March 29, 2019, response denied California's request for consistency review in part because leatherback sea turtles were not consistently present in

California waters, but NOAA itself designated critical habitat for leatherback sea turtles in state waters based on their presence. 77 Fed. Reg. 4170, 4172 (Jan. 26, 2012).

## THIRD CLAIM FOR RELIEF

### Violation of the MMPA and APA (Issuance of Permit Despite Anticipated Take of Guadalupe Fur Seals)

101. Paragraphs 1 through 85 are hereby realleged as though set out in full.

102. NOAA's issuance of exempted fishing permits for California longline fishing is a final agency action within the meaning of the APA. By issuing these permits, NOAA has violated and continues to violate the MMPA and the APA. 16 U.S.C. § 1371(a)(5)(E); 50 C.F.R. § 229.20; 5 U.S.C. § 706(2)(A), (D).

103. NOAA projected the take of a Guadalupe fur seal as a result of issuing the 2026 longline fishing permits.

104. NOAA has not received MMPA authorization for take of Guadalupe fur seals resulting from the 2026 longline fishing permits.

105. NOAA's issuance of the 2026 longline permits in absence of an MMPA take authorization is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the MMPA. 5 U.S.C. § 706(2)(A), (D).

## FOURTH CLAIM FOR RELIEF

### Violation of the Magnuson Stevens Act and the APA (Unlawful Issuance of Permits)

106. Paragraphs 1 through 85 are hereby realleged as though set out in full.

107. Issuing the California longline fishing permits is a final agency action within the meaning of the Administrative Procedure Act.

108. For the reasons set forth above, the California longline fishing permits are not consistent with applicable law. NOAA's decision to issue the permits despite the inconsistency with applicable law exceeds its authority under the Magnuson-Stevens Act, 50 C.F.R. § 600.745(b)(3)(iii)(D), (b)(3)(v)(H), and is arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2)(A), (D).

## REQUEST FOR RELIEF

For the reasons stated above, Plaintiffs respectfully request that the Court:

A. Declare that NOAA violated NEPA and the APA in issuing the California longline fishing permits;

B. Declare that NOAA violated CZMA and the APA in issuing the California longline fishing permits;

C. Declare that NOAA violated the MMPA and the APA in issuing the California longline fishing permits;

D. Declare that NOAA violated the Magnuson-Stevens Act and the APA in issuing the California longline fishing permits;

E. Vacate and set aside the California longline fishing permits;

F. Vacate and set aside the environmental impact statement and record of decision;

G. Issue any appropriate injunctive relief;

H. Award Plaintiffs the costs of this litigation, including reasonable attorneys' fees; and

I. Provide such other relief as the Court deems just and proper.

DATE: August 14, 2026

Respectfully Submitted,

*/s/ Catherine Kilduff*

Catherine W. Kilduff (CA Bar No. 256331)
Kristen Monsell (CA Bar No. 304793)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7100
Facsimile: (510) 844-7150

*Attorneys for Plaintiffs Center for Biological Diversity and Turtle Island Restoration Network*